**FILE COPY**

JUDGE BAER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CV    3086**

| | |
|---|---|
| PEI LICENSING, INC., a Delaware corporation, | : CIV. ACTION NO.: |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| PERFUME NETWORK, a New York corporation; MAJOR PERFUMES, INC., a New York corporation; TRADE PLUS, INC., a New York corporation; HARBANS LAL GERA, an individual; and BHARAT GERA, an individual, | : |
| | : |
| Defendants. | : |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii
I.     INTRODUCTION ..................................................................................................... 1
II.    BACKGROUND FACTS ........................................................................................... 1
   A.   The PEI Intellectual Property ............................................................................ 1
   B.   PEI's Business and Reputation ........................................................................... 4
   C.   Defendants' History of Trademark Counterfeiting and Infringement ................ 5
   D.   Defendants' Infringement of the 360° Intellectual Property ............................. 6
III.   PEI IS ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING
DEFENDANTS' ACTS OF TRADEMARK AND TRADE DRESS  INFRINGEMENT ........... 9
   A.   Defendants' Sale of Their Infringing Products Is Irreparably Harming the 360° Marks
   and 360° Trade Dress, and the Goodwill Associated Therewith ............................... 9
   B.   PEI Will Likely Prevail on Its Claim for Trademark Infringement ................... 10
      1.   The 360° Marks Are Valid and Protectable ................................................ 10
      2.   Consumers Are Likely To Be Confused As To The Source of Defendants' Infringing
      Products ...................................................................................................... 11
   C.   PEI Will Likely Prevail on Its Claim for Trade Dress Infringement ................. 15
      1.   The 360° Trade Dress Is Inherently Distinctive ........................................ 15
      2.   The 360° Trade Dress Has Attained Secondary Meaning ........................... 16
      3.   Consumers Are Likely To Be Confused as a Result of Defendants'  Infringement of the
      360° Trade Dress ........................................................................................ 17
   D.   There Is a Fair Ground For Litigation, and the Balance of Hardships Tips Decidedly in
   PEI's Favor .................................................................................................................. 17
IV.    CONCLUSION ....................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

Banff, Ltd. v Federated Dept. Stores, 841 F.2d 486, 491 (2d Cir. 1988) .....................................13

Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004, 1013 (5th Cir.), Cert. denied, 423 U.S. 868 (1975)....................................................................11

Box Office, Inc. v. Showtime/Movie Channel, Inc., 832 F.2d 1311 (2d Cir. 1987)...................11

Corning Glass Works v. Jeanette Glass Co., 308 F. Supp. 1321, 1328 (S.D.N.Y.), aff'd, 432 F.2d 784 (2d Cir. 1970) .............................................................................................................20

Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2d Cir. 1979).......11

Dana Braun, Inc. v. SML Sport Ltd., 2003 U.S. Dist. LEXIS 21349 *43 (S.D.N.Y. November 25, 2003)...............................................................................................................12, 18, 19

Edison Bros. Stores, Inc. v. Cosmair, Inc., 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987)...............13

Firma Melodiya v. ZYX Music GmbH, 882 F. Supp. 1306, 1311 (S.D.N.Y. 1995) ..............11, 12

Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122 (2d Cir. 1994)......................11

Fun-Damental Too v. Gemmy Indus. Corp., 111 F.3d 993, 998-99 (2nd Cir. 1997)..11, 17, 18, 19

Gas, Inc., 754 F.2d 91 (2d Cir. 1985).........................................................................................12

Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392 (2d Cir. 1986), cert. denied, 484 U.S. 817 ......................................................................................................................11

Gruner + Jahr USA Publishing, Div. of Gruner + Jahr Printing & Publishing Co. v. Meredith Corp., 991 F.2d 1072, 1078 (2d Cir. 1993) .............................................................15

H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) ...............................................................11

Inc., 505 U.S. 763 (1992) ..........................................................................................................20

Kadant, Inc. v. Seeley Mach., Inc., 244 F. Supp. 2d 19, 28 (S.D.N.Y. 2003)............14, 15, 16, 17

Kraft General Foods, Inc. v. Allied Old English, Inc., 831 F. Supp. 123, 131 (S.D.N.Y. 1993)..14

Lesportsac, Inc. v. K-Mart Corp., 754 F.2d 71, 79 (2d Cir. 1985)...............................................20

Metlife, Inc. v. Metro. Nat'l Bank, 388 F. Supp. 2d 223, 229 (S.D.N.Y. 2005) .........14, 15, 16, 17

Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987).......................11

NBA Props. v. Untertainment Records LLC, 1999 U.S. Dist. LEXIS 7780 *25 (S.D.N.Y. May 26, 1999 ......................................................................................................................14

Omega Importing Corp. v. Petri-Kline Camera Co., 451 F.2d 1190, 1195 (2d Cir. 1971)...........11

Paco Rabanne Parfums, S.A. v. Norco Enterps., 680 F.2d 891, 894 (2d Cir. 1982).....................12

Polaroid Corp. v. Polaroid Electronics Corp., 287 F.2d 492 (2d Cir. 1961 ..................................13

Polymer Technology Corp. v. Mimran, 975 F.2d 58, 62 ...............................................................11

Sands, Taylor & Wood Company, 978 F.2d 947, 958 (7th Cir. 1992) .........................................12

Supermarkets, Inc., 428 F.2d 379, 381 (2d Cir. 1970)..................................................................12

Warner Bros., Inc. v. Gay Toys, Inc ., 658 F.2d 76 (2d Cir. 1981)................................................11

Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc., 698 F.2d 862 (7th Cir. 1983) ..11

Y. State Soc'y Certified Public Accountants v. Eric Louis Assocs., Inc., 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999)...............................................................................................................13

**Statutes**

15 U.S.C. § 1051 ..........................................................................................................................11

15 U.S.C. § 1057(b)......................................................................................................................13

## I.    **INTRODUCTION**

Defendants Perfume Network, Inc. ("Perfume Network"), Major Perfumes, Inc. ("Major Perfumes"), Trade Plus, Inc. ("Trade Plus"), Harbans Lal Gera ("Harbans Gera") and Bharat Gera (collectively "Defendants") have, without authorization or consent, misappropriated and infringed Plaintiff PEI Licensing, Inc.'s ("PEI") famous trademarks and trade dress. Specifically, Defendants intentionally copied PEI's 360° trademark and the entire look and feel of the packaging for PEI's 360° perfumes, and have knowingly trafficked in these infringing products in reckless disregard of PEI's trademark and trade dress rights.

Defendants' willful and intentional infringement of PEI's trademarks has and continues to irreparably harm PEI and PEI's intellectual property, reputation and goodwill, and rightful market position. In view of the foregoing, PEI respectfully requests that this Court issue a preliminary injunction restraining Defendants from all of their unlawful activity.

## II.    **BACKGROUND FACTS**

### A.    **The PEI Intellectual Property**

PEI owns all right, title and interest in and to, *inter alia*, the two federal registrations for 360° and 360° PERRY ELLIS in connection with fragrances and personal care products for men and women, including perfumes.[1] These registrations are valid, subsisting, unrevoked and uncancelled, and constitute *prima facie* evidence of PEI's rights in the 360° trademark.[2] Additionally, PEI's registration for 360° PERRY ELLIS is incontestable as a matter of law.[3] PEI also owns common law rights in the 360° trademark and the design of its bottle in which its 360° perfume is sold based on its use in commerce thereof (PEI's registered and common law trademark rights in the 360° trademark and bottle design are collectively referred to as the "360° Marks").[4] PEI has sold products under the 360° Marks since at least 1993, and the 360° Marks are famous and widely-recognized brands.[5]

---

[1] *See* Declaration of Geri L. Mankoff (Mankoff Decl.), Ex. A.
[2] *Id.*
[3] *Id.*
[4] *Id.*, ¶ 2.
[5] *Id.*

PEI also owns trade dress rights in the bottle in which the 360° perfume is sold. In order to build customer recognition, PEI has used the same packaging for the 360° perfume.[6] PEI sells four styles of the 360° perfume, White, Grey, Blue and Red.[7] All of the packaging for the White, Grey, Blue and Red 360° perfume includes, but is not limited to: (a) a long, thin, cylindrical outer-packaging; (b) a thin ring of a different color from the rest of the outer-packaging approximately one inch from the top of the cylinder; (c) the 360° trademark placed approximately one inch below the ring; (d) a description of the perfume specifications at the base of the outer-packaging; (e) a long, thin, cylindrical bottle design; (f) a thick ring of brushed or polished silver at the top of the cylindrical bottle; and (g) a round, glass ball covering the perfume dispenser at the top of the bottle.[8]

In addition, the glass for the Blue 360° perfume bottle and dispenser ball cover is blue; the glass for the Red 360° perfume bottle and dispenser ball cover is red; the glass for the Grey 360° perfume bottle and dispenser ball cover is clear with aqua colored liquid; and the glass for the White 360° perfume bottle and dispenser ball cover is clear with yellow liquid (all of the foregoing design elements are collectively referred to as the "360° Trade Dress").[9] PEI has sold products under the 360° Trade Dress since at least 1993.[10] The 360° Marks and 360° Trade Dress are collectively referred to as the "360° Intellectual Property." The following are color photographs of PEI's products embodying the 360° Intellectual Property:

---

[6] *Id.*, ¶ 3 Ex. B.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*

**Grey 360° Perfume**



**Blue 360° Perfume**



**Red 360° Perfume**



**White 360° Perfume**



### B.    PEI's Business and Reputation

PEI is a leader in the design, marketing and distribution of a wide variety of apparel, shoes, accessories and fragrances for men and women, including fragrances and personal care products for men and women, namely perfumes, eau de toilette, body lotions, bath and shower gels, after shaves, after shave balm, and deodorants (the "360° Products") sold under and/or in connection with the 360° Intellectual Property.[11]  PEI advertises and sells the 360° Products through department stores, independent retailers and PEI's own retail stores in the United States and more than forty-five other countries, as well as through its internet website at www.perryellis.com.[12]

For more than twenty-five years, PEI's reputation and distinctive image have been consistently developed across an expanding number of products, as well as across both domestic and international markets.[13]  PEI has carefully built its reputation by, among other things, adhering to strict quality control standards and its commitment to customer service.[14]  As such, the 360° Products are manufactured pursuant to specific, stringent guidelines.[15]  In addition, PEI spends million dollars annually to advertise and promote the 360° Products and 360° Intellectual Property, worldwide.[16]

As a result of PEI's extensive marketing and promotional efforts, as well as the high quality of the 360° Products, the 360° Products have achieved an outstanding reputation among consumers.[17]  The 360° Marks and 360° Trade Dress have become well and favorably known in the industry and to the public as the exclusive source of the 360° Products, and have come to symbolize the goodwill and reputation for excellence of 360° Products.[18]  PEI's marketing efforts, combined with its attention to quality and construction, have resulted in more than forty-four million dollars in sales annually of the 360° Products since 2004, worldwide.[19]  PEI's continuous and broad use of the 360° Marks and 360° Trade Dress has expanded their renown

---

[11] *Id.*, ¶ 4.
[12] *Id.*
[13] *Id.*, ¶ 5.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*, ¶ 6.
[18] *Id.*
[19] *Id.*

and enabled PEI to achieve fame and celebrity in the fragrance product market.[20]  PEI intends to continue its use of the 360° Intellectual Property in the future.[21]

### C.    Defendants' History of Trademark Counterfeiting and Infringement

Defendants have a long history of infringing the intellectual property of perfume brand owners prior to this action.  In 1990, Compagnie Francaise brought suit against Bharat Gera for trademark infringement in the Southern District of New York that resulted in entry of a permanent injunction against Bharat Gera.[22]  Shortly thereafter, in 1991, Paul Sebastian brought suit against Harbans Gera and his former company Perfume USA f/k/a Perfumes R Us for trademark infringement.[23]  This action was also in the Southern District of New York and also resulted in entry of a permanent injunction against Harbans Gera.[24]

In 1993, Harbans Gera was sued again for trademark counterfeiting and infringement, this time by Cathy Carden in the Southern District of Florida, which resulted in Gera's compliance with Cathy Carden's trademark rights.[25]  In 2005, US Customs and Border Protection Services impounded more than 30,000 units of counterfeit Jivago products that Perfume Network had attempted to import, and Jivago filed a lawsuit thereafter against Harbans Gera and Perfume Network in the Southern District of New York.[26]  The Jivago action remains pending.[27]

Finally, in January 2007, Animale Group, Inc. filed lawsuits for willful trademark counterfeiting and infringement against Harbans Gera and Perfume Network in the Southern District of New York (the "New York Animale Action") and against, *inter alia*, Bharat Gera and Trade Plus in the Southern District of Texas (the "Laredo Animale Action").[28]  Based on an overwhelming showing of evidence of Defendants' willful counterfeiting of Animale products,

---

[20] *Id.*
[21] *Id.*
[22] *See* Declaration of G. Roxanne Elings ("Elings Decl."), Ex. A.
[23] *Id.*, Ex. B.
[24] *Id.*
[25] *Id.*, Ex. C.
[26] *Id.*, Ex. D.
[27] *Id.*
[28] *Id.*, Ex. E.

Animale obtained temporary restraining orders, asset restraining orders and seizure orders against Defendants in the New York and Laredo Animale Actions.[29]

### D.    Defendants' Infringement of the 360° Intellectual Property

Defendants, without authorization or license from PEI, have used, reproduced, copied and/or infringed the 360° Intellectual Property in connection with their manufacturing, distributing, exporting, importing, advertising, marketing, selling and/or offering to sell infringing copies of the 360° Products under the label "365 Days" (the "Infringing Products").[30]

PEI originally learned that a company named Perfume Americana Wholesale, Inc. ("Perfume Americana") was selling Infringing Products at its storefront at 1216 Broadway, New York, New York 10001.[31]  PEI went to Perfume Americana's retail location at 1216 Broadway and purchased two bottles of Infringing Products, one each of men's and women's perfume. When PEI initially asked the salesman for "365", he immediately reached for PEI 360°.[32]  PEI asked again for "365", and the salesman went to the other side of the store and obtained two bottles of the Infringing Products.[33]  When PEI inquired who made the "365" perfume, the salesman stated that it was a "new private company" with a "private designer."[34]  PEI purchased the two bottles for $10.00 apiece.[35]

Both the external packaging and the bottling for the Infringing Products is identical to that for genuine 360° Products.[36]  Defendants sell four styles of Infringing Products, White, Grey, Blue and Red.[37]  All of the packaging for the Infringing Products includes, but is not limited to:  (a) a long, thin, cylindrical outer-packaging; (b) a thin ring of a different color from the rest of the outer-packaging approximately one inch from the top of the cylinder; (c) the 365 Days trademark placed approximately one inch below the ring; (d) a description of the perfume

---

[29] *Id.*  Bharat Gera and Trade Plus have been dismissed from the Laredo Animale Action on personal jurisdiction grounds, which dismissal Animale is appealing.  The Court in the Laredo Animale Action has not suggested that the preliminary restraints against Bharat Gera and Trade Plus were inappropriate for any reason other than procedural. *Id.*, ¶ 6.
[30] Mankoff Decl., ¶ 7.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*, ¶ 8 Ex. C.
[37] *Id.*

specifications at the base of the outer-packaging; (e) a long, thin, cylindrical bottle design; (f) a thick ring of brushed or polished silver at the top of the cylindrical bottle; and (g) a round, glass ball covering the perfume dispenser at the top of the bottle.[38]  In addition, the glass for the Blue Infringing Product bottle and dispenser ball cover is blue; the glass for the Red Infringing Product perfume bottle and dispenser ball cover is red; the glass for the Grey Infringing Product perfume bottle and dispenser ball cover is clear with aqua colored liquid; and the glass for the White Infringing Product perfume bottle and dispenser ball cover is clear with yellow liquid.[39]

The following are color photographs of Defendants' Infringing Products:

**Grey Infringing Product:**



**Blue Infringing Product:**



---

[38] *Id.*
[39] *Id.*

**Red Infringing Product**                    **White Infringing Product**

            

The Infringing Products are not genuine 360° Products bearing the 360° Intellectual Property.[40] PEI did not manufacture, inspect or package the Infringing Products, and did not approve the Infringing Products for sale and/or distribution.

On October 4, 2006, PEI sent a cease and desist letter to Perfume Americana.[41]  Perfume Americana responded on October 6, 2006, by identifying Perfume Network as its supplier.[42] Over the next several months, PEI sought and obtained incomplete documentation evidencing some of Defendants' infringement.[43]  PEI attempted to settle this matter with Defendants to no avail.[44]

---

[40] *Id.*, ¶ 9.
[41] *Id.*, ¶ 10.
[42] *Id.*
[43] *Id.*
[44] *Id.*

**III.   PEI IS ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ACTS OF TRADEMARK AND TRADE DRESS INFRINGEMENT**

In order to obtain preliminary injunctive relief, PEI must establish: (1) irreparable harm; and (2) either (a) probable success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation with the balance of hardships tipping decidedly in favor of the party requesting preliminary relief.[45]  This standard applies where a preliminary injunction is sought for both trademark and trade dress.[46]  As shown below, PEI meets each of these criteria.

**A.    Defendants' Sale of Their Infringing Products Is Irreparably Harming the 360° Marks and 360° Trade Dress, and the Goodwill Associated Therewith**

Once a violation of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*, as amended (the "Lanham Act") is demonstrated, injunctive relief will readily issue pursuant to Section 34 thereof, 15 U.S.C. § 1116.[47]  Courts have granted preliminary relief when a party's proprietary rights are threatened by the sale of potentially inferior versions of its products, bearing marks or ornamentation indicating affiliation with the moving party.  Courts base this relief on the trademark holder's "inability to control the nature and quality of the infringer's goods . . . not because the infringer's goods are necessarily inferior."[48]

A high probability of confusion as to source or sponsorship almost inevitably establishes irreparable harm to a trademark owner.[49]  This is because the damage to a trademark owner

---

[45] *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *Firma Melodiya v. ZYX Music GmbH*, 882 F. Supp. 1306, 1311 (S.D.N.Y. 1995); *Fun-Damental Too v. Gemmy Indus. Corp.*, 111 F.3d 993, 998-99 (2nd Cir. 1997)

[46] *Id.*

[47] *See, e.g., Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1013 (5th Cir.), *Cert. denied*, 423 U.S. 868 (1975); *Warner Bros., Inc. v. Gay Toys, Inc .*, 658 F.2d 76 (2d Cir. 1981); *Fun-Damental Too v. Gemmy Indus. Corp.*, 111 F.3d at 999.

[48] *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862 (7th Cir. 1983); *accord, El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986), *cert. denied*, 484 U.S. 817; *Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir.), *amended reported at* 1992 U.S.App. LEXIS 32204 (2d Cir. 1992), *aff'd* 37 F.3d 74 (2d Cir. 1994 ("actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain").

[49] *Omega Importing Corp. v. Petri-Kline Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971); *see also Home Box Office, Inc. v. Showtime/Movie Channel, Inc.*, 832 F.2d 1311 (2d Cir. 1987) (a showing of likelihood of confusion as to source or sponsorship establishes the risk of irreparable harm as well as the requisite likelihood of success on the merits).

through diminished goodwill, loss of control over reputation or loss of quality control of its product is irreparable, and such irreparable injury is generally presumed sufficient for the grant of a preliminary injunction.[50] Indeed, this Court has held that with respect to trademark and trade dress infringement claims, "irreparable harm may be presumed upon a showing that [the] trademark is protectable and that a likelihood of confusion exists as to the ownership or source of goods in question."[51]

As set forth below, PEI can demonstrate that it owns the 360° Marks and that a likelihood of confusion will result from Defendants' sale of Infringing Products.[52] Thus, there is a presumption that PEI will be irreparably harmed.[53] Moreover, as Defendants continue to sell Infringing Products, the irreparable harm that PEI faces will be exacerbated. Finally, Defendants' sale of their Infringing Products puts inferior products over which PEI has no control on to the market for purchase by consumers. Consumers will associate the poor quality of the Infringing Products with PEI, thereby forever damaging PEI's goodwill and reputation.

## B.    PEI Will Likely Prevail on Its Claim for Trademark Infringement

To prevail on its trademark infringement claim, PEI must prove, *inter alia*: (1) it has rights senior to Defendants in the 360° Marks; and (2) there is a likelihood of confusion between Defendants' Infringing Products and PEI's 360° Marks and Products as used or intended to be used in the marketplace.[54]

### 1.   The 360° Marks Are Valid and Protectable

Through its pleadings and the declarations supporting its request for a preliminary injunction, PEI has introduced evidence verifying its ownership of federal registrations for the 360° Marks.[55] These registrations are *prima facie* evidence of the validity of the trademarks PEI seeks to protect, as well as PEI's exclusive rights to use the 360° Marks in commerce on or in

---

[50] *Paco Rabanne Parfums, S.A. v. Norco Enterps.*, 680 F.2d 891, 894 (2d Cir. 1982) ("likelihood of damage to reputation and good will . . . entitles a plaintiff to preliminary relief"); *Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379, 381 (2d Cir. 1970); *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91 (2d Cir. 1985).

[51] *See Firma Melodiya*, 882 F. Supp. at 1311; *Dana Braun, Inc. v. SML Sport Ltd.*, 2003 U.S. Dist. LEXIS 21349 *43 (S.D.N.Y. November 25, 2003).

[52] *See* Section III.B.

[53] *See Firma Melodiya*, 882 F. Supp. at 1311.

[54] *See Quaker Oats v. Sands, Taylor & Wood Company*, 978 F.2d 947, 958 (7th Cir. 1992).

[55] *See* Mankoff Decl., Ex. A.

connection with the goods or services specified in the registrations.[56] Furthermore, PEI has used and is currently using the 360° Marks in commerce on or in connection with its sale of the 360° Products, and plans to continue such use in the future.[57] Accordingly, PEI has introduced evidence sufficient to create a likelihood that it will prevail on this first element of its trademark infringement claim.

### 2. Consumers Are Likely To Be Confused As To The Source of Defendants' Infringing Products

In the Second Circuit, likelihood of confusion is assessed with reference to the factors enunciated in *Polaroid Corp. v. Polaroid Electronics Corp.*[58] The relevant factors used to analyze whether there is likelihood of confusion are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.[59]

If there is a showing that Defendants intended to copy the 360° Marks, "likelihood of confusion will be presumed as a matter of law."[60] "If the junior user has 'adopted the mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement.'"[61] Thus, the issue to be determined by this factor is "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."[62]

---

[56] *See* 15 U.S.C. § 1057(b).

[57] *See* Mankoff Decl., ¶¶ 4-6.

[58] *See Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961, *cert. denied*, 368 U.S. 820 (1961); *see also Banff, Ltd. v Federated Dept. Stores*, 841 F.2d 486, 491 (2d Cir. 1988).

[59] *See Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d at 495.

[60] *The N. Y. State Soc'y Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999), citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).

[61] *See Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987).

[62] *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 131 (S.D.N.Y. 1993). Courts will infer intent to capitalize on the plaintiff's goodwill "[w]hen a company appropriates an identical mark that is well known and has acquired a secondary meaning." *Id.* at 132.

Here, Defendants' Infringing Products are nearly identical to the 360° Products in nearly all respects, including in name, bottle design and packaging.[63] Defendants' selection of a name - 365 Days - for their Infringing Products that is so close to the 360° Mark, coupled with their willingness to copy the entire look and feel of the 360° Products, demonstrates that Defendants intentionally chose the infringing 365 Days moniker to associate their Infringing Products with the 360° Products in the minds of consumers. Based on the intent element alone, then, the Court can and should presume a likelihood of confusion on PEI's claim for trademark infringement.

The remaining, applicable *Polaroid* factors further support a finding that Plaintiffs are likely to succeed in showing a likelihood of confusion resulting from Defendants' acts of trademark infringement.

### a.    Strength of the Marks

The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source.[64] A trademark can be either inherently or commercially strong. Marks are inherently strong, if they "almost *automatically* tell a customer that they refer to a brand."[65] "Among the marks held to be inherently distinctive are those that are 'fanciful' or 'arbitrary.'"[66] "A mark is arbitrary ... if there is no logical relationship whatsoever between the mark and the product on which it is used."[67] Commercial strength is determined by looking to, among other things a brand-owner's duration of use of the mark, advertising investment and extent of sales figures.[68]

The 360° Marks are both inherently and commercially strong. The term "360°" has no connection to perfume, and is therefore an arbitrary designation. In turn, the 360° Marks are inherently strong. In addition, PEI has used the 360° Marks in connection with the 360° Products since 1993, has invested millions of dollars in advertising and has generated hundreds

---

[63] *See* Mankoff Decl., Ex. C.
[64] *See Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 229 (S.D.N.Y. 2005).
[65] *See Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d 19, 28 (S.D.N.Y. 2003).
[66] *Id.*
[67] *Id.*
[68] *NBA Props. v. Untertainment Records LLC*, 1999 U.S. Dist. LEXIS 7780 *25 (S.D.N.Y. May 26, 1999)

of millions of dollars of sales.[69]  The 360° Marks are, therefore, also commercially strong.  As a result, this factor favors a finding of likelihood of confusion.

### b.    Similarity of the Marks

"In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."[70]  Typefaces are relevant considerations when evaluating marks' similarities.[71]  In assessing the similarity of the marks, courts look at the "general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember."[72]

Defendants' infringing 365 Days mark is very similar in look and sound to the 360° Marks.  Moreover, Defendants use identical or very similar font in connection with their infringing 365 Days mark.[73]  Taking into account the general impression created by Defendants use of the 365 Days mark, the marks are similar and this factor favors a finding of likelihood of confusion.

### c.    Proximity of the Products and Their Competitiveness with One Another

This Polaroid factor "concerns whether and to what extent the two products compete with each other and the nature of the products themselves and the structure of the relevant market."[74]  The court should examine the extent to which the products compete with one another, and how this competition may lead to consumer confusion.[75]  Competitive proximity considers two elements: market proximity and geographic proximity.[76]  Where the parties develop, market and sell similar products to the same consumers, this factor favors a finding of confusion.[77]

---

[69] *See* Mankoff Decl., ¶¶ 4-6.
[70] *Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d at 230 citing *Gruner + Jahr USA Publishing, Div. of Gruner + Jahr Printing & Publishing Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993).
[71] *Id.*
[72] *See Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d at 29.
[73] *See* Mankoff Decl., Exs. B and C.
[74] *Id.*, at 29-30.
[75] *Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d at 232.
[76] *Id.*
[77] *See Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d at 30.

- 13 -

PEI sells its 360° Products to consumers of perfume nationwide and internationally. Defendants also sell their Infringing Products to consumers of perfume, and, because of the breadth of PEI's geographic market coverage, sell to consumers in many of the same markets. Accordingly, this factor favors a finding of likelihood of confusion.

### d.   Bridging the Gap

Because the parties already sell the same types of products, this factor is inapposite in considering whether a likelihood of confusion exists.[78]

### e.   Actual Confusion

Actual confusion need not be shown to prevail under the Lanham Act; a plaintiff need only establish that there is a likelihood of confusion as to a mark's source.[79] Indeed, to hold otherwise, would eviscerate the likelihood of confusion test. In any event, PEI anticipates that discovery will reveal instances of actual confusion.

### f.   Quality of the Products

"Quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product."[80] PEI adheres to strict quality control standards, and its 360° Products are manufactured pursuant to specific, stringent guidelines.[81] PEI has had no opportunity to ensure that the Infringing Products are manufactured according to the same standards and quality control,[82] and this factor therefore favors a finding of likelihood of confusion.

### g.   Consumer Sophistication

"The sophistication of the intended consumer is a factor to be considered in evaluating the likelihood of consumer confusion. A higher degree of consumer sophistication decreases the risk of consumer confusion."[83] Defendants' Infringing Products retail for only $10 per bottle.[84]

---

[78] *Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d at 232.
[79] *Id.*
[80] *Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d at 235.
[81] *See* Mankoff Decl., ¶ 5.
[82] *Id.*
[83] *Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d at 235.
[84] *See* Mankoff Decl., ¶ 7.

As such, a consumer cannot be expected to expend significant time and care in purchasing an Infringing Product. As a result, this factor favors a finding of likelihood of confusion.

Because all of the applicable *Polaroid* factors favor a finding of confusion, PEI should be deemed likely to prevail on its claim for trademark infringement, and entitled to a preliminary injunction against Defendants thereon.[85]

### C.    PEI Will Likely Prevail on Its Claim for Trade Dress Infringement

To prevail on its trade dress infringement claim, PEI must prove that its trade dress is inherently distinctive and/or has attained secondary meaning and that a likelihood of confusion exists as a result of Defendants' use of similar trade dress.[86]

### 1.    The 360° Trade Dress Is Inherently Distinctive

"[T]rade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection."[87] The Supreme Court has emphasized that an inherently distinctive trade dress is one whose "intrinsic nature serves to identify a particular source of a product," although it may not yet have widespread identification among consumers.[88] The Court should evaluate trade dress distinctiveness by looking at all its elements and considering the total impression the trade dress gives to the observer.[89] Even where some of the individual elements of a trade dress are generic or descriptive, the impression given by all of them in combination may be inherently distinctive.[90]

Most importantly, however, the varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited.[91] As a consequence, a trade dress in the product packaging arena - as opposed to other types of trade dress such as in connection with product

---

[85] *See, e.g., Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d at 33 (even where consumers were sophisticated and no evidence of actual confusion was introduced, Plaintiff was entitled to a preliminary injunction where its mark was strong, the marks were similar, the parties sell the same types of product and the Defendant acted with intent).

[86] *Fun-Damental Too v. Gemmy Indus. Corp.*, 111 F.3d at 999.

[87] *Id.*, at 1000.

[88] *Id.*

[89] *Id.*, at 1001.

[90] *Id.*

[91] *Id.*, at 1000.

design - will typically be arbitrary or fanciful and meet the inherently distinctive requirement for Section 43(a) protection."[92]

The 360° Trade Dress is inherently distinctive. When viewed in its totality, the combination of package shape and color, graphic design, location of typeface and font of typeface is arbitrary and bears no relationship to the nature or intended use of the 360° Products. As a result, PEI should be deemed likely to succeed in showing that it has valid, protectable trade dress.

### 2.    The 360° Trade Dress Has Attained Secondary Meaning

Not only is the 360° Trade Dress inherently distinctive, PEI has valid rights therein because the 360° Trade Dress has attained secondary meaning. There are six elements that Courts use as a guide in its analysis of secondary meaning: (1) advertising expenditures; (2) evidence that consumers link the trade dress to a particular source; (3) unsolicited media coverage of the product; (4) the sales success of the product; (5) attempts to plagiarize the product; and (6) length and exclusivity of use.[93]

In *Dana Braun*, the court found that secondary meaning existed where the plaintiff had used its trade dress for five years and distributed 10,000 catalogs to consumers on a quarterly basis.[94] The *Dana Braun* court also noted that defendant's attempts to copy the plaintiff's trade dress supported a finding of secondary meaning. Similarly, PEI has used the 360° Trade Dress for more than thirteen years, invested millions of dollars in advertising and had annual sales of more than forty-four millions dollars each year since 2004. In addition, as detailed above in Section II.D, Defendants have willfully and intentionally copied the 360° Trade Dress and attempted to cover up their infringement, showing that the 360° Trade Dress has secondary meaning. Consequently, the Court should find that PEI is likely to prove, at a minimum, that the 360° Trade Dress is protectable through a showing of secondary meaning.

---

[92] *Id.*
[93] *Dana Braun, Inc. v. SML Sport Ltd.*, 2003 U.S. Dist. LEXIS 21349 *39 (S.D.N.Y. 2003).
[94] *Id.*

### 3.    Consumers Are Likely To Be Confused as a Result of Defendants' Infringement of the 360° Trade Dress

The same *Polaroid* factors apply to PEI's trade dress claim as its trademark claim.[95]  As the photographs of the 360° Products and the Infringing Products illustrate, Defendants have intentionally copied every element of the 360° Trade Dress.  The 360° Trade Dress is arbitrary and therefore considered strong for purposes of the likelihood of confusion test.[96]  The 360° Trade Dress and the trade dress used by Defendants on their Infringing Products is virtually identical as to every element of the 360° Trade Dress.  The parties sell the same products, through the same channels to the same consumers.  The 360° Products are of the highest quality. And finally, consumers purchasing $10 bottles of infringing perfume are not exercising substantial discretion.  Accordingly, there is a likelihood of confusion resulting from Defendants' infringement of the 360° Trade Dress.

### D.    There Is a Fair Ground For Litigation, and the Balance of Hardships Tips Decidedly in PEI's Favor

PEI strongly believes that it has established beyond question the required likelihood of success as to Defendants' liability for trademark and trade dress.  However, should this Court not find such likelihood of success, PEI respectfully submits that it has at least raised serious questions going to the merits of its claims, and that the balance of hardships tips decidedly in PEI's favor.

For the same reasons that PEI is likely to prevail on its claims, as discussed above, PEI has raised serious questions for which there is a fair ground for litigation.[97]  This Court must then balance PEI's harm from the wrongful denial of a preliminary injunction against any harm Defendants may suffer from granting an injunction that would not be cured by prevailing on the merits and recovering on PEI's injunction bond.[98]  As set forth above, the harm to PEI is irreparable.[99]  The continued intentional, unauthorized use of the 360° Intellectual Property threatens PEI's reputation because PEI will lose control over the quality and appearance of its products, which will ultimately destroy the value of the 360° Intellectual Property as a

---

[95] *Fun-Damental Too v. Gemmy Indus. Corp.*, 111 F.3d at 1002.
[96] *Id.* at 1003.
[97] *See* Section III.B-C, *supra.*
[98] *See* [Proposed] Order filed herewith requiring entry of bond.
[99] *See* Section III.A, *supra.*

- 17 -

designation of source. The harm to Defendants, on the other hand, is at worst monetary. Moreover, Defendants have no legitimate right to sell their Infringing Products or otherwise use the 360° Intellectual Property without PEI's permission. Indeed, given "the probable outcome of this action, this is a loss which [defendants] may justifiably be called upon to bear."[100]

After balancing Defendants' potential monetary harm against (a) the irreparable harm to PEI's goodwill and reputation built through years of promoting and selling high quality products and (b) the disastrous long-term effects of unfettered infringement on PEI, the harm to PEI outweighs any potential harm to Defendants.[101]

## IV.    CONCLUSION

In light of the foregoing, PEI respectfully requests that the Court grant its motion for order to show cause for preliminary injunction.

Dated:  April 16, 2007

Respectfully submitted,

GREENBERG TRAURIG LLP

By: _____

G. Roxanne Elings (GE 8321)
David Saenz (DS 1976)
MetLife Building
200 Park Avenue, 34th Floor
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

Attorneys for Plaintiff PEI Licensing, Inc.

---

[100] *Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970).
[101] *See, e.g., Lesportsac, Inc. v. K-Mart Corp.*, 754 F.2d 71, 79 (2d Cir. 1985) ("the potential damage to Lesportsac's mark and goodwill in the absence of a preliminary injunction outweighs the short-term economic harm that K-Mart may suffer"), *abrogated on other grounds by Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).